UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917<br><br>Case No. C-07-5944 JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART HITACHI PARTIES' MOTION FOR SUMMARY JUDGMENT** |
| This Order Relates To:<br><br>All Indirect Purchaser Actions<br><br>*Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 3:11-cv-01656-SC;<br><br>*Alfred H. Siegel as Trustee of the Circuit City Stores, Inc. Liquidating Trust v. Hitachi, Ltd., et al.*, No. 3:11-cv-05502-SC;<br><br>*Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 3:11-cv-05513-SC;<br><br>*Target Corp, et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 3:11-cv-05514-SC;<br><br>*Sears, Roebuck and Co. and Kmart Corp. v. Chunghwa Picture Tubes, Ltd.*, No. 3:11-cv-05514-SC<br><br>*Interbond Corporation of America, d/b/a BrandsMart USA v. Hitachi, et al.*, No. 3:11-cv-06275-SC;<br><br>*Office Depot, Inc. v. Hitachi, Ltd., et al.*, No. 3:11-cv-06276-SC;<br><br>*CompuCom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 3:11-cv-06396-SC;<br><br>*Costco Wholesale Corporation v. Hitachi, Ltd., et al.*, No. 3:11-cv-06397-SC;<br><br>*P.C. Richard & Son Long Island Corporation, et al. v. Hitachi, Ltd., et al.*, No. 3:12-cv-02648-SC;| |

*Schultze Agency Services, LLC on behalf of Tweeter OPCO, LLC and Tweeter Newco, LLC v. Hitachi, Ltd., et al.*, No. 3:12-cv-02649-SC;

*Tech Data Corporation, et al. v. Hitachi, Ltd., et al.*, No. 3:13-cv-00157-SC.

Before the Court is Hitachi America, Ltd. ("HAL"), Hitachi Displays, Ltd. ("HDP"), and Hitachi Electronic Devices (USA), Inc.'s ("HED(US)"), collectively the "Hitachi Moving Parties" or "Defendants," Motion for Summary Judgment. ECF No. 2974-53.[1] For the reasons below, the Court denies the motion in part, and grants it in part.

## I.  BACKGROUND

The factual history is well known to the parties and has been recited in the Court's prior orders. By way of summation, this case is predicated upon an alleged conspiracy to fix the prices of cathode ray tubes ("CRTs"), a core component of tube-style screens for common devices including televisions and computer monitors. The conspiracy ran from March 1, 1995 to November 25, 2007 (the "Conspiracy Period"), involved many of the major companies that produced CRTs, and allegedly resulted in overcharges of billions of U.S. dollars to domestic companies that purchased and sold CRTs or products containing CRTs ("CRT Finished Products"). A civil suit was originally filed in 2007, ECF No. 1, consolidated by the Joint Panel on Multidistrict Litigation shortly thereafter, see ECF No. 122, assigned as a Multidistrict Litigation case ("MDL") to Judge Samuel Conti, see id., and ultimately transferred to the undersigned, see ECF No. 4162. In addition to two class actions, this MDL involves various direct actions from individual plaintiffs who opted out of the class actions, including the DAPs that oppose the present motions. Each DAP alleges that it bought at least one CRT Finished Product from a Defendant or an entity owned or controlled by a Defendant.

The following facts are relevant specifically to the instant motion. The three Hitachi Moving Parties are all wholly-owned subsidiaries of Hitachi, Ltd. ("HTL"). HDP and HAL were directly owned subsidiaries of HTL, while HED(US) was directly owned by HAL. ECF No.

---

[1] This is the unredacted version of Defendants' motion.

2

3274-2 at 3.  HDP was formed in 2002 as a spin-off from HTL's Display Group.  ECF No. 2974-3 at 2.  HDP "never engaged directly in the manufacturing or sale of CRTs," id, but it had a 25% ownership interest in Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Shenzhen") between 2002 and 2007, which did manufacture CRTs, ECF No. 3274-2 at 7-8.  HAL never manufactured CRTs, but it sold them in the United States between 1995 and 1998, before HTL transferred its U.S. CRT sales division to HED(US).  ECF No. 2974-14 at 4-5.  HED(US) manufactured CRTs in the United States until 2002 and sold them until 2003.  ECF No, 2974-5 at 3.

Plaintiffs claim that HTL "exercised tight control over" the Hitachi Moving Parties during the CRT conspiracy such that all the Hitachi entities "participated in the conspiracy as a single enterprise."  ECF No. 3266-4 at 7.  Plaintiffs separately argue that each of the Hitachi Moving Parties independently participated in the CRT conspiracy.

The Hitachi Moving Parties filed a motion for summary judgment on November 6, 2015.  ECF No. 2974-53.  They argue 1) that there was no global Hitachi CRT conspiracy that renders the Hitachi Moving Parties liable and 2) that there is no evidence to show that any of the Hitachi Moving parties independently engaged in anticompetitive conduct.  Id.[2]

## II.    LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials.  Fed. R. Civ. P. 56(c)(1)(a).  A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  An issue is "genuine" only if there is sufficient evidence for a reasonable

---

[2] In a footnote in their reply brief, the Hitachi Moving Parties object to "much" of the evidence Plaintiffs submitted in support of their opposition brief.  ECF No. 3439-18 at 17 n.7.  Defendants then filed a separate chart listing each of Plaintiffs' exhibits and Defendants' objections.  ECF No. 3451.  Under Local Rule 7-3, "[a]ny evidentiary and procedural objections to the opposition must be contained within the reply brief or memorandum."  Defendants' chart does not comply with this rule.  Moreover, the Court finds many of Defendants' hearsay objections unpersuasive, particularly as to the many documents that are business records or constitute party admissions.  For both reasons, the Court will not address the Hitachi Moving Parties' evidentiary objections.

fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). A fact is "material" if the fact may affect the outcome of the case. Id. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party. Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests, Inc., 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Indeed, it is not the duty of the district court "to scour the record in search of a genuine issue of triable fact." Id. "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the non-moving party must introduce some significant probative evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotations omitted). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"In antitrust cases, these general standards are applied even more stringently and summary judgments granted more sparingly." Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n, 620 F.2d 1360, 1364 (9th Cir. 1980). As a general matter, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. . . . The character and effect of a conspiracy are not to be judged

4

by dismembering it and viewing its separate parts, but only by looking at it as a whole." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–99 (1962) (alterations omitted). Nonetheless, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Rather, to defeat a motion for summary judgment, "a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility" that the alleged conspirators acted independently.'" Id. (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984)).

## III. ANALYSIS

### A. Global Hitachi Conspiracy

There is insufficient evidence to raise a triable issue of material fact that HTL "exercised tight control over" the Hitachi Moving Parties during the CRT conspiracy such that all the Hitachi entities "participated in the conspiracy as a single enterprise." ECF No. 3266-4 at 7.[3] Plaintiffs claim that HTL deployed its employees from Japan "to fill virtually every pricing and production decision-making position worldwide" and "appoint[ed] HTL employees to serve on the Hitachi Moving Parties' boards of directors. Id. at 7-8. Even if supported by the evidence, this practice of "seconding" alone cannot make the Hitachi Moving Parties liable for actions that HTL may have taken in furtherance of the conspiracy. See Esco Corp. v. United States, 340 F.2d 1000, 1009 (9th Cir. 1965) (holding that each Defendant's "participation must be proved by evidence relating to its participation," not that of another defendant). Rather, there must be some evidence that those employees then engaged in anticompetitive conduct at their new host employer. With the exception of HED(US), which is discussed in greater detail below, Plaintiffs have put forward no specific evidence that seconded HTL employees at either HAL or HDP participated in some larger

---

[3] The Court acknowledges Defendants' arguments that executives in the Hitachi Moving Parties' organizations have denied participating in the CRT conspiracy, ECF No. 2974-53 at 10. Likewise, the Court notes that other members of the alleged conspiracy have denied communicating with Hitachi affiliates regarding the conspiracy. Id. at 13-14. This evidence alone does not entitle Defendants to summary judgment, but it does shift the burden to Plaintiffs "to show that a genuine issue of material fact exists" with regard to Defendants' participation in the CRT conspiracy. Nissan Fire & Marine Ins. Co., 210 F.3d at 1102–03.

5

Hitachi enterprise to support the CRT conspiracy. Without this showing, Plaintiffs' extensive discussion of HTL's alleged participation in the conspiracy though glass meetings and other communications with competitors cannot get them across the summary judgment finish line. ECF No. 3266-4 at 8-11.

### B.   Individual Participation by the Hitachi Moving Parties

While Plaintiffs failed to demonstrate that Defendants are liable by virtue of participating in a global Hitachi conspiracy, they have raised a triable issue of material fact as to the individual participation of HED(US). The Court concludes, however, that there is no evidence that HAL or HDP engaged in anticompetitive conduct related to the CRT conspiracy.

#### 1.   HED(US)

The evidence that HED(US) participated in the conspiracy is the strongest as among the three Defendants. First, Plaintiffs adduced evidence that HTL employees who had participated in the CRT conspiracy were seconded to HED(US) and continued to take anticompetitive actions in their new roles. For example, HTL sent its employee Kazumasu Hirai to HED(US) and made him Vice President there. In that role, Hirai communicated with competitors Toshiba America and Matsushita America regarding the CRT conspiracy. For example, a Matsushita employee testified that he had a "telephone conversation [with Hirai] in which we exchanged market information, such as production capacity and the production situation, and also discussed the exchanged CRT price situation information." ECF No. 3273-8 at 25. HED(US) General Manager of Sales Thomas Heiser likewise discussed CRT production information with competitors. In a document summarizing a meeting with Thomson Consumer Electronics, North American Tube Division, Heiser described how the "main topics of discussion" included "FIDTV l6x9 CPT production," a potential "shortage" of CPTs given sales increases, Thomson's "plans to introduce" a new CPT, and pressure Thomson felt to produce certain types of CPTs given production plans of other competitors, like Toshiba. ECF No. 3273-8 at 73. Heiser and the Thomson representative "agreed to have this meeting every six months at alternating sites." Id.

HED(US) also forwarded information it gathered from competitors to HTL. In 2000, HED(US) emailed HTL information that one of its employees, Sales Manager Yuji Mitsumoto,

6

had gathered regarding competitor Matsushita's American CRT production. ECF No. 3273-8 at 86-87. The email read: "Mr. Mitsumoto notified us of AMEC's production line situation, so it may have been sent to you, but I am forwarding it as reference. I am worried about the PRT supply and demand balance! If there is any information on the Japan side, please let me know." Id. Taken together, this evidence "tend[s] to exclude the possibility that [HED(US)] acted independently." In re Citric Acid Litig., 191 F.3d 1090, 1096 (9th Cir. 1999) ("*Citric Acid II*").

Defendants dispute the inferences to be drawn from Plaintiffs' evidence, see ECF No. 3439-18 at 18, but a reasonable jury could conclude that the meetings and information exchanges described above, among others, reveal HED(US)'s participation in the CRT conspiracy. Indeed, Defendants' reply brief does not respond directly to this evidence except to argue generally that "sporadic communications among employees of competitors—for both social and business purposes—are found in every industry, are not necessarily anticompetitive, and therefore, are themselves not probative of conspiracy." ECF No. 2974-53 at 20. These stock responses are not a "plausible and justifiable reason for [HED(US)'s] conduct that is consistent with proper business practice." In re Citric Acid Litig., 191 F.3d 1090, 1094 (9th Cir. 1999). The Court finds that a reasonable jury could interpret the interactions described above as demonstrating HED(US)'s participation in the CRT conspiracy. The motion for summary judgment as to HED(US) is denied.

### 2. HDP

Plaintiffs' evidence that HDP participated in the conspiracy is insufficient to defeat summary judgment. To start, Plaintiffs make much of the fact that HDP is simply a spin-off of HTL, and that "[e]very aspect of HTL's CRT business was transferred to HDP, including the officers and personnel responsible for the manufacture and sale of CRTs . . . ." ECF No. 3266-4 at 16. But this transfer is of little relevance given that HTL had stopped manufacturing or selling CRTs by the time the transfer took place. ECF No. 2974-3 at 2. And even if it were relevant, continuity between HTL and HDP is not probative of participation in the CRT conspiracy if there is no showing that HDP perpetuated the allegedly anticompetitive conduct.

Nor does HDP's 25% ownership of Shenzhen show that HDP participated in the conspiracy. "One company's minority ownership interest in another company is not sufficient by

itself to make the owner a competitor, for purposes of the antitrust laws, of the subsidiary's rivals." Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C., 148 F.3d 1080, 1088 (D.C. Cir. 1998). Moreover, the fact that HDP representatives served on Shenzhen's board and that HDP may have assisted Shenzhen with its North American CRT sales efforts does not create a triable issue of fact as to whether HDP had "substantial control over the affairs and policies of the subsidiary." Id. Plaintiffs also claim Shenzhen kept HDP apprised of its cartel agreements with competitors and that HDP passed information to Shenzhen, ECF No. 3266-4 at 18, but the evidence does not appear to support those assertions. To show that Shenzhen told HDP about its cartel agreements, for instance, Plaintiffs cite an email dated May 8, 2005. ECF No. 3266-4 at n. 56. The email describes Shenzhen's plans to restrict CRT production, but the Court sees no discussion in that email of agreements with competitors. ECF No. 3273-18. Indeed, Plaintiffs themselves describe the email as Shenzhen reporting "to HDP its plans for a June 2005 CRT-line shutdown." ECF No. 3266-4 at n. 56. In other words, the evidence does not support Plaintiffs' claim.

    Plaintiffs' best evidence is that that HDP passed information about Shenzhen to competitors on a single occasion. Specifically, HDP emailed information about Shenzhen's CRT production levels to a Matsushita employee after that employee sent the following request: "This is Nishimura of Matsushita Toshiba Picture Display Co., Ltd. CPT business of this fiscal year has been extremely difficult, and it is as if we are sailing into the storm and good weather has yet to come. How about your company?" ECF No. 3273-16 at 54-55. To be sure, this is circumstantial evidence of HDP's participation in the conspiracy to fix the prices of CRTs. But, the Ninth Circuit has defined the summary judgment inquiry in antitrust cases as "whether all the evidence considered as a whole can reasonably support the inference that [HDP] conspired with the admitted conspirators to fix prices." In re Citric Acid Litig., 191 F.3d 1090, 1097 (9th Cir. 1999). Here, this one potentially anticompetitive act must be weighed against the evidence that many members of the cartel denied Hitachi's participation in the conspiracy, see generally ECF No. 2974-53 at 13-15, and the fact that Plaintiffs do not even claim that HDP representatives attended glass or bilateral meetings with HDP's competitors. Simply put, no juror could reasonably rely on this isolated email exchange to infer that HDP participated in the CRT conspiracy. The Court

8

therefore grants Defendants' motion for summary judgment as to HDP.[4]

### 3. HAL

Plaintiffs also fail to create a triable issue of material fact as to HAL's participation in the CRT conspiracy. There is no evidence that HTL exercised direct control over HAL's CRT prices and imposed mandatory price increases. Plaintiffs focus on the fact that HAL employees reported to HTL and traveled to HTL's headquarters, ECF No. 3266-4 at 16, but those facts alone are not demonstrative of a global Hitachi conspiracy.[5]

Nor do Plaintiffs put forward any evidence that HAL independently engaged in anticompetitive conduct. Plaintiffs emphasize that Kenichi Fukuzawa, who set prices at HAL between 1995 and 1998 engaged in "direct information exchanges" with co-conspirators. ECF No. 3266-4 at 15. But the email in which Fukuzawa refers to those "direct information exchanges" was sent in 1999, <u>after</u> HAL became HED(US). ECF No. 3273-8 at 18-19. It does not, therefore, speak to his actions while at HAL or to HAL's participation in the conspiracy more generally. Next, Plaintiffs argue HAL had an explicit policy "to keep our prices high to avoid the appearance of stealing market share." ECF No. 3266-4 at 15 (citing ECF No. 3273-10 at 243). This statement, made in a fax from Tom Heiser, is best evaluated in context:

> The pricing policies of HED(US) for very good reasons do not allow us to take larger market share at our customers. SMCA for example would be happy to give us more business if our pricing were more competitive with PDCC. We have however chosen to keep our prices high to avoid the appearance of stealing market share and that has some of its own advantages. As it is today we will constantly face extreme competition at our customer base until such a time as a shortage occurs in the market place for large size capacity.
>
> These are the best answers I can give you that has basis in fact from the U.S. market. MOST IMPORTANTLY UNLESS WE PROVIDE SOMETHING DIFFERENT WE ARE JUST ONE OF MANY PLAYERS. WE MUST OFFER THE BEST PRODUCT AT THE BEST PRICE AND THE BEST SERVICE

---

[4] The Court also rejects Plaintiffs' successor-in-interest theory of liability. ECF No. 3266-4 at 26-27. Among other defects, there is no evidence that the transaction creating HDP "was fraudulently entered into in order to escape liability." See In re Lithium Ion Batteries Antitrust Litig., Case No. 13-MD-2420 YGR, 2014 WL 4955377, at *36, n.34 (N.D. Cal. Oct. 2, 2014). Defendants also contest Plaintiffs' assertion that no consideration was paid for HDP. ECF No. 3439-18 at 12.

[5] In support of this claim, Plaintiffs identify a letter from HAL employees to HAL customer Aydin Controls. ECF No. 3273-2 at 219. But a jury could not reasonably conclude, based on that letter alone, that HAL participated in a global Hitachi conspiracy.

AND NOT BE CONTENT TO EXPECT BUSINESS BECAUSE WE ARE HITACHI, WE MUST EARN BUSINESS IN THE U.S. TO KEEP IT. WITH THIS GOAL IN MIND WE CAN WIN EVENTUALLY.

No. 3273-10 at 243. The Court does not see how a reasonable juror could conclude that Heiser's comments illustrate HAL's involvement in the CRT conspiracy. The overarching message is that the U.S. CRT market is competitive and that Hitachi must perform well to succeed. Perhaps if there were other evidence that HAL had conspired with competitors in the sale or manufacture of CRTs, this fax might have greater relevance. But given the evidence before it, the Court finds that Defendants are entitled to summary judgment as to HAL's participation in the CRT conspiracy.

## CONCLUSION

The Court grants Defendants' motion for summary judgment as to HAL and HDP, and denies it as to HED(US).

IT IS SO ORDERED.

Dated: February 7, 2017

_____
JON S. TIGAR
United States District Judge